# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THOMAS M. DEVELIN,<br><br>　　　　Defendant. | CASE NO. 2:22-CR-178<br><br>JUDGE SARAH D. MORRISON<br><br>Sentencing Memorandum of the United States |

　　The United States hereby submits its Sentencing Memorandum with respect to Defendant Thomas M. Develin. The United States has one pending objection. For the reasons that follow, a sentence of 87 months of imprisonment and 3 years of supervised release would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. Forfeiture is also required in this case.

## BACKGROUND

　　In March 2022, the Columbus Division of Police Counterterrorism Unit began an investigation based on Discord group chat messages received from the Ohio Army National Guard and the Ohio Statewide Terrorism and Analysis Center. PSR ¶ 13. Discord is a social media platform that allows users to communicate by text, talk, and video. *Id.* In the Discord group, Defendant Thomas M. Develin expressed extremist views and sent antisemitic, misogynistic, and racist messages. *Id.* He also regularly discussed violence, including mass violence against Jews and Black people, individual violence against people he perceived as having wronged him, and apparently indiscriminate violence, such as an attack on a Budweiser brewing facility. *Id.* Mr. Develin also discussed illegal firearms activity, and his messages connected his illegal firearms activity with his desire for violence. *Id.*

Based in part on these messages, Columbus police obtained and executed a search warrant on Mr. Develin's residence on March 31, 2022. PSR ¶ 14. During the search, officers seized firearms, explosives, a ghost gun printer, ammunition, and more. PSR ¶ 15. A search of his vehicle found law-enforcement ballistic plates, night-vision goggles, a ballistic helmet, and a large quantity of ammunition. *Id.* Mr. Develin was arrested and interviewed. PSR ¶¶ 14, 16. After being charged with state crimes, he was released on bond. *See* PSR ¶ 14. Agents later searched a property in Chesterhill, Ohio, where they found more firearms, firearms parts, and other related property. PSR ¶ 16. Mr. Develin's state charges remain unresolved.

On June 29, 2022, Mr. Develin was arrested after having been charged by federal Criminal Complaint with one count of Engaging in the Business Without a License (Firearms), in violation of 18 U.S.C. § 922(a)(1)(A); one count of Illegal Possession of a Machine Gun, in violation of 18 U.S.C. § 922(o); one count of Failure to Register as a Dealer, Manufacturer, or Importer, or to Pay Required Tax, in violation of 26 U.S.C. § 5861(a); one count of Receipt or Possession of Firearm Made in Violation of the NFA, in violation of 26 U.S.C. § 5861(c); and one count of Making a Firearm in Violation of the NFA, in violation of 26 U.S.C. § 5861(f). (Complaint, R.1.) He was ordered detained pending trial. (Order, R.14.)

On September 22, 2020, following plea negotiations, the United States Attorney filed a Bill of Information charging Mr. Develin with one count of Making Firearms in Violation of the National Firearms Act, in violation of 26 U.S.C. §§ 5861(f) and 5871; one count of Unlawfully Engaging in the Business of Manufacturing and Dealing Machineguns, in violation of 26 U.S.C. §§ 5861(a) and 5871; and one count of Manufacturing and Dealing Firearms Without a License, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D). (Information, R.20 at 74–75.) The Bill of Information also contained forfeiture allegations. (*Id.* at 76–77.) On the same day, the

2

Parties filed a Plea Agreement, wherein Mr. Develin agreed to plead guilty to all counts of the Information, and to forfeit the firearms and ammunition involved in his offenses. (Plea Agreement, R.21 at 78, 81–82.) The Plea Agreement also contained multiple stipulations regarding the applicable sentencing guidelines. (*Id.* at 80–81.) Among other stipulations, Mr. Develin agreed that his offense level should be increased by six levels because the offense involved 25–99 illegal firearms, and that his offense level should be increased by four levels because he engaged in the trafficking of firearms. (*Id.* at 81.) On October 20, 2022, Mr. Develin waived his right to an indictment and pleaded guilty. The Court accepted his guilty pleas and adjudged him guilty.

The Final Presentence Investigation Report was issued on January 9, 2023. (*See* PSR, R.29.) Sentencing in this matter is scheduled for February 28, 2023.

## ARGUMENT

The Probation Officer calculated that Mr. Develin's Total Offense Level is 21 and that his Criminal History Category is I. PSR ¶¶ 43, 58. The Probation Officer accurately noted that these calculations, if correct, would result in advisory guidelines ranges of 37 to 46 months of imprisonment; a fine of $15,000 to $150,000; and supervised release of 1 to 3 years. PSR ¶¶ 90, 95, 102.

The United States has one unresolved objection. The United States will first address its objection, and then turn to the statutory sentencing factors under 18 U.S.C. § 3553(a).

**I.     Because Mr. Develin transferred firearms to people he had reason to believe intended to use or dispose of the firearms unlawfully, the Court should apply the enhancement for a defendant who "engaged in the trafficking of firearms."**

The Probation Officer erred by not applying the agreed-upon four-level enhancement that applies to defendants who "engaged in the trafficking of firearms." U.S.S.G. § 2K2.1(b)(5); *see* PSR ¶¶ 31–33. If this objection were sustained, Mr. Develin's offense level would be 25 and his guidelines imprisonment range would be 57–71 months.

Section 2K2.1(b)(5) of the U.S. Sentencing Guidelines provides for a four-level enhancement if "the defendant engaged in the trafficking of firearms." As relevant here, an Application Note clarifies that this enhancement applies if a defendant "disposed of two or more firearms to another individual," and "knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual . . . who intended to use or dispose of the firearm unlawfully." U.S.S.G. § 2K2.1 app. n. 13(A).

Mr. Develin agreed in the Plea Agreement that the trafficking enhancement should apply to him. (*See* Plea Agreement, R.21 at 81 (agreeing that "[p]ursuant to U.S.S.G. § 2K2.1(b)(5), the offense level should be increased by 4 levels because the Defendant engaged in the trafficking of firearms").) He should be held to his end of the bargain.

Mr. Develin agreed to the trafficking enhancement for good reason: The enhancement should apply because he had reason to believe he was selling firearms to individuals who intended to use or dispose of them unlawfully. Certain firearms are unlawful for *any* person to possess or use in all or nearly all circumstances. *See, e.g.*, 26 U.S.C. § 5861(d) (criminalizing the possession of unregistered machineguns, including fully automatic firearms, conversion devices, short-barreled rifles, and more); 18 U.S.C. § 922(o) (same); 18 U.S.C. § 922(p) (firearms not detectable by a metal detector); 18 U.S.C. § 922(k) (firearms with obliterated serial number).

4

Accordingly, when a defendant disposes of such a firearm to *anyone*, he necessarily disposes of the firearm to an individual who intends to use or dispose of it unlawfully within the meaning of Application Note 13.

Case law supports this conclusion. The First Circuit has affirmed the application of the trafficking enhancement where a defendant sold a sawed-off shotgun to a cooperating witness. *United States v. Taylor*, 845 F.3d 458, 461 (1st Cir. 2017). In part because such a firearm is "illegal to possess in all but the most unusual circumstances," the court of appeals concluded that the defendant had reason to believe the cooperating witness would use or dispose of the firearm illegally. *Id.* Using the same logic, the Eighth Circuit has affirmed the application of the trafficking enhancement where the defendant sold an unregistered automatic firearm and an unregistered hand grenade to a confidential source working with the government. *United States v. Lomax*, 910 F.3d 1068, 1070 (8th Cir. 2018). The fact that possession of the weapons was "necessarily unlawful" supported the application of the trafficking enhancement. *Id.*; *see also United States v. Pepper*, 747 F.3d 520, 525 (8th Cir. 2014) (applying the trafficking enhancement in a case involving the transfer of a unregistered machinegun).

Courts have also considered whether the firearm has a serial number as a factor in applying the trafficking enhancement. Guns without serial numbers are associated with crime because they "cannot be traced by law enforcement." *United States v. Ortiz*, 64 F.3d 18, 22 (1st Cir. 1995). Accordingly, several cases—including an unpublished Sixth Circuit case—have applied the trafficking enhancement where the defendant sold firearms with obliterated serial numbers. *See, e.g.*, *Taylor*, 845 F.3d at 460 (holding that "removal of a serial number is indicative of anticipation that the gun will be used in criminal activity, and thus that Taylor knew or should have known that [the buyer] intended to use or dispose of the firearm unlawfully"

(quotation marks omitted)); *United States v. Jenkins*, 528 F. App'x 483, 486 (6th Cir. 2013) (concluding that the fact that the defendant sold a firearm that "had no serial number" supported the inference that the defendant knew or had reason to believe that the firearm would be used or disposed of unlawfully).

The same logic applies to firearms that never had serial numbers. Guns that were unlawfully made without serial numbers offer the same benefit to criminals as those with obliterated numbers—namely, they are untraceable. In a case from last month, the First Circuit recognized as much when it affirmed the application of the trafficking enhancement in part because the defendant sold two ghost guns that never had serial numbers. *United States v. Bischoff*, 58 F.4th 18, 24 (1st Cir. 2023). Notably, this case came out after the Final PSR in this case was released, and therefore the Probation Officer did not have the benefit of *Bischoff* in her consideration of the trafficking enhancement.

A recent proposed amendment by the U.S. Sentencing Commission supports the conclusion that ghost guns that never had serial numbers should be treated the same as guns with obliterated serial numbers. The guidelines currently contain an enhancement if any firearm in the offense "had an altered or obliterated serial number." U.S.S.G. § 2K2.1(b)(4)(B). That enhancement currently does not apply to guns that never had serial numbers. Earlier this month, the Sentencing Commission proposed a revision of Section 2K2.1(b)(4)(B) that would treat guns that never had serial numbers the same as guns with obliterated serial numbers. *See* Notice of Proposed Amendments to the Sentencing Guidelines, 88 Fed. Reg. 7180, 7197 (Feb. 2, 2023). The proposed amendment was in response to comments "that the very purpose of 'ghost guns' is to avoid the tracking and tracing systems associated with a firearm's serial number and that they

increasingly are associated with violent crime." *Id.* Selling ghost guns that never had serial numbers is probative that the buyer intended to use or dispose of the guns unlawfully.

Applying these principles here, the four-level trafficking enhancement should apply to Mr. Develin because he sold firearms that were unlawful for *anyone* to possess or use. In his Statement of Facts, Mr. Develin admitted that he had made and sold "untraceable 3D-printed firearms," which are "illegal firearms." (Plea Agreement, R.21 at 86.) He also admitted that he had "manufactured and sold six 'lowers' that he knew were illegal to an unknown individual." (*Id.*) He also made and advertised for sale illegal conversion devices. PSR ¶ 17. Because these firearms were illegal in all circumstances, he had reason to believe that he was selling them to individuals "who intended to use or dispose of the firearm[s] unlawfully."

Mr. Develin also had reason to believe his buyers intended to use or dispose of the firearms unlawfully because he sold firearms, lower receivers, and conversion devices that lacked serial numbers. (*See* PSR ¶ 16; Complaint, R.1-1 at 47–48.) Accordingly, they were untraceable by law enforcement. (*See* Plea Agreement, R.21 at 86 (Mr. Develin made "untraceable 3D-printed firearms").) This is another indication that Mr. Develin had reason to believe he was selling firearms to people who intended to use them unlawfully.

Moreover, Mr. Develin's own words support the enhancement. He sent a message to another person asking if he wanted to join a Discord group about 3D printing. (Complaint, R.1-1 at 35.) The person demurred, saying he was worried that the ATF would "raid" the Discord group. (*Id.*) Mr. Develin replied, "Just be me and sell machine guns to felons and gangbangers." (*Id.*) This, too, shows he had reason to believe the people buying his untraceable firearms intended to use them unlawfully.

7

For these reasons, Mr. Develin was right to agree in the Plea Agreement that the trafficking enhancement applies. The Court should apply the four-level enhancement and calculate that the guidelines range is 57–71 months of imprisonment.

### II. Based on the statutory sentencing factors, the United States recommends a term of imprisonment of 87 months.

Turning to the § 3553(a) factors, the United States recommends an above-guidelines sentence of 87 months in prison and a 3-year term of supervised release.

*Nature and circumstances of the offenses.* Mr. Develin committed several serious firearms crimes. He manufactured, possessed, and sold untraceable 3D-printed firearms and illegal lower receivers. PSR ¶ 19. He also manufactured an illegal short-barreled rifle. *Id.* And he manufactured, possessed, and advertised for sale more than 50 devices designed to convert semiautomatic firearms into fully automatic machineguns. *Id.* After he had done all that, Mr. Develin obstructed justice by destroying and hiding evidence of his criminal acts. PSR ¶¶ 36–37.

Starting with the ghost guns: From 2020 until his March 2022 arrest, Mr. Develin made untraceable 3D-printed firearms, commonly known as "ghost guns." PSR ¶ 16. He bought a 3D printer and made the ghost guns for profit. *Id.* He was not a licensed manufacturer or dealer of firearms, so this was against the law. *See* 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D). This was not a mere technical violation. Federal law regulates the manufacture and sale of firearms in ways that promote public safety. For example, licensed manufacturers and dealers are required to conduct criminal background checks before selling firearms. *See* 18 U.S.C. § 922(t). Manufacturers are also required to mark each firearm they produce with a unique serial number, to promote "tracking of inventory and record-keeping by licensees; tracing specific firearms used in crimes; identifying firearms that have been lost or stolen; and assisting in the prosecution of

firearm offenses." *United States v. Harris*, 720 F.3d 499, 502–03 (4th Cir. 2013). Mr. Develin followed none of these important safeguards when he made and sold firearms.

Mr. Develin also made a short-barreled rifle and manufactured and sold at least six illegal lower receivers for AR-type rifles. PSR ¶ 19. A receiver is the part of a firearm that brings together the firearm's other components—it "provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." (Complaint, R.1-1 at 26.) Federal law requires manufacturers to engrave or cast the serial number on the firearm's receiver. 18 U.S.C. § 923(i). Any rifles that used Mr. Develin's 3D-printed lower receivers would therefore not bear serial numbers. *See* PSR ¶ 16. Making matters more concerning, he sold six of these illegal lower receivers to an unknown individual. (PSR ¶ 17; Plea Agreement, R.21 at 86.)

Mr. Develin's production of a short-barreled rifle likewise presents safety concerns. The National Firearms Act, or NFA, criminalizes the manufacture, possession, and sale of particularly dangerous weapons in almost all circumstances. *See* 26 U.S.C. § 5861; 26 U.S.C. § 5845(a). Among these are short-barreled rifles. *Id.*; PSR ¶ 17. Mr. Develin knew this, as evidenced by the fact that he posted a photograph of the short-barreled rifle he had made along with the message, "Uh oh I accidentally made an NFA item." (Complaint, R.1-1 at 29.)

Perhaps most dangerously, Mr. Develin made and advertised for sale more than 50 devices designed to convert semiautomatic firearms into fully automatic machineguns. Whereas semiautomatic firearms shoot one round per pull of a trigger, machineguns automatically shoot "more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Because of the risks presented by continuous fire, the NFA tightly regulates machineguns, and it is unusual for a person without a federal firearms license to lawfully possess

9

them. *See* 26 U.S.C. § 5861; 26 U.S.C. § 5845(a), (b). Federal law applies the same restrictions to parts designed to convert a weapon into a machinegun. 26 U.S.C. § 5845(b). These conversion devices are legally defined as machineguns themselves, *id.*, and legal possession is unusual.

The widespread availability of 3D printing has made the manufacture of illegal conversion devices simple and inexpensive. The results can be devastating. Conversion makes weapons more dangerous in multiple ways. Most plainly, it allows a person to fire more rounds per second. It also can make the firearm harder to control. The additional recoil can make it harder to aim the weapon effectively. This is especially true of the Glock switch that Mr. Develin possessed. *See* PSR ¶ 18. A Glock switch is an illegal conversion device that turns a handgun into a fully automatic pistol, *id.*, and the increased kick on a smaller firearm can be more disruptive to the shooter.

In addition to the Glock switch, Mr. Develin possessed a "coat hanger" device, auto sears, and a bump stock. The coat hanger device and the auto sears are similar; they convert semiautomatic AR-type rifles into fully automatic rifles. PSR ¶ 18. A bump stock has a similar effect but a different operation. It "replaces the standard stock on a rifle and allows a shooter to fire a semiautomatic rifle at rates similar to automatic rifles." PSR ¶ 16. Mr. Develin produced at least 50 conversion devices. PSR ¶ 19. He advertised the auto sears for sale. PSR ¶ 17. These devices present serious public safety risks, given that they are untraceable devices that convert AR-type rifles into fully automatic firearms.

Shortly before his arrest, Mr. Develin also hid and destroyed evidence. He told agents that on March 28, 2022, he went to the Chesterhill property and hid multiple ghost guns, a bump stock, an unfinished firearm frame, and a Military Improvised Explosive Device instruction manual. PSR ¶ 16. He also went to the property the following day and burned additional

evidence in a firepit. *Id.* When ATF agents later searched there, they located firearms, firearm parts, and two IED manuals, but they did not locate a bump stock. *Id.*

Mr. Develin also communicated with another individual to destroy evidence. He communicated with the other person on Telegram, an encrypted communication platform that proudly advertises that it has never provided user data to law enforcement. *See* Telegram Privacy Policy at https://telegram.org/privacy (last accessed Feb. 20, 2023). Mr. Develin told the other person that all the incriminating evidence "is being buried or burned today," and when the other person told him to burn a specific file, Mr. Develin confirmed, "Yep being burned." (Complaint, R.1-1 at 39.) Mr. Develin also said he would be "speaking with an attorney, then going out of town to get rid of this stuff." (*Id.* at 40.) The other individual replied, "Do it now and do it discreetly. Leave no trace anywhere. Burn the shit and take the ashes somewhere else." (*Id.*)

Although much of the attention in this case has focused on Mr. Develin's extremist ideology, his firearms crimes are serious on their own. Mr. Develin produced untraceable firearms, lower receivers, and conversion devices and sold them to others, including people he did not know. As he well knew, the conversion devices made already dangerous weapons (AR-type rifles) into even more dangerous ones (illegal machineguns). When he thought law enforcement may be coming, he destroyed evidence in an attempt to obstruct justice. His serious offenses warrant a lengthy sentence.

*The sentencing range established by the Sentencing Commission.* Notably, the guidelines range does not account for the full amount of firearms Mr. Develin possessed, because of what one judge has deemed "a void" in the sentencing guidelines. *United States v. Hixson*, __ F. Supp. 3d __, No. 21-CR-050016, 2022 WL 3908595, at *1 (N.D. Ill. Aug. 30, 2022). The Sentencing Guidelines provide that a defendant's offense level should be increased based on the

11

number of firearms involved in the crime. *See* U.S.S.G. § 2K2.1(b)(1). A six-level increase applies if the offense involved 25–99 firearms. U.S.S.G. § 2K2.1(b)(1)(C).

The Parties agreed that Mr. Develin's offense level should be increased by six levels "because the offense involved 25–99 illegal firearms." (Plea Agreement, R.21 at 81 (citing U.S.S.G. § 2K2.1(b)(1)(C)).) Mr. Develin possessed more than 50 devices intended to convert semiautomatic firearms into fully automatic firearms. The definition of "firearm" in 26 U.S.C. § 5845(a) includes "a machinegun." And 26 U.S.C. § 5845(b) defines "machinegun" to include "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun," such as a Glock switch, a coat hanger device, or an auto sear.

Yet the sentencing guidelines contain an apparently unintended loophole. A narrow subset of "firearms" under 26 U.S.C. § 5845(a) are not considered "firearms" under U.S.S.G. § 2K2.1. Application Note 1 to that guideline provides that "'[f]irearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)." That statute, in turn, defines "firearm" to mean "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." Although this definition would include many items defined as a "firearm" under 26 U.S.C. § 5845(a)—such as short-barreled rifles and fully automatic firearms—it does not include auto sears or other devices that convert semiautomatic firearms into fully automatic firearms. In short, a conversion device is a "firearm" under the definition in § 5845(a), but not under the definition in § 921(a)(3), and therefore not under the definition in the sentencing guideline. Earlier this month, the Sentencing Commission publicly sought comment on whether the guideline should be amended to include conversion devices

12

within the guideline's definition of "firearm." *See* Notice of Proposed Amendments to the Sentencing Guidelines, 88 Fed. Reg. at 7198.

If Mr. Develin's conversion devices qualified as firearms under the guideline, he would receive a six-level increase for an offense involving 25–99 firearms, rather than the current four-level increase for 8–24 firearms. *See* PSR ¶ 30; U.S.S.G. § 2K2.1(b)(1)(C). In that circumstance (and if the objection were sustained), his offense level would be 27 and his guidelines imprisonment range would be 70–87 months. This is the range the Parties expected when they executed the Plea Agreement. (*See* Plea Agreement, R.21 at 80–81.)

Because this void in the firearms guideline results in a guidelines range that fails to reflect seriousness of Mr. Develin's offenses, the United States recommends that the Court impose an above-guidelines sentence. The United States has found only one case that has addressed how to account for the fact that the guidelines' definition of "firearm" does not include conversion devices, and in that case, the judge imposed an above-guidelines sentence for this reason. In *United States v. Hixson*, the defendant possessed and sold at least 9 Glock switches. 2022 WL 3908595, at *2. In calculating the guidelines range, the district judge identified that Glock switches were not "firearms" under U.S.S.G. § 2K2.1, and applied no enhancement for the number of firearms. *Id.* at *5. The guidelines range was 30–37 months. *Id.*

The judge in *Hixson* applied an upward variance, however, in recognition that the guidelines range "woefully underrepresent[ed] the seriousness of the offenses" because it "completely ignore[d] the Glock switches." *Id.* at *8. The court rejected the idea of "[s]entencing Mr. Hixson within the sentencing range" because doing so would "not account for the possession, sale, and distribution of the Glock switches." *Id.* Instead, the court imposed a 66-month sentence—three years above the bottom of the guidelines range. *Id.*

An upward variance is appropriate here for the same reasons. One of the most concerning aspects of Mr. Develin's criminal conduct was his manufacture of conversion devices. Yet the guidelines range does not account in any way for these items. *See* PSR ¶¶ 29–30. The Probation Officer has identified this flaw as a reason to consider an upward departure. *See* PSR ¶¶ 108–09. In order to account for the full seriousness of the offenses, an upward variance is warranted.

*Need to protect the public from further crimes of the defendant.* An upward variance is also appropriate because the guidelines range does not account in any way for Mr. Develin's danger to the community as reflected in his support for mass violence and his virulent antisemitism, misogyny, and racism—all of which make his illegal firearm possession more perilous. *See* PSR ¶ 110 (identifying this as a reason to consider an upward departure).

Mr. Develin repeatedly expressed his hate for Jews, women, and Black people in messages and social media posts. He denied the Holocaust and showed a desire to be involved in mass shootings at synagogues and Jewish schools. (PSR ¶¶ 45–46; Complaint, R.1-1 at 4–8.) He claimed he would "hunt" Black people (using a slur) and posted other messages advocating racism. (Complaint, R.1-1 at 8–9.) He championed rape, opined that rape is preferable to consensual sex, and claimed he had "become so radicalized against women that I've forgotten how to act rationally around them when one of them decides it's a good idea to speak to me." (*Id.* at 9–11.)

No one can predict with certainty when a person motivated by violent extremist ideologies will become a mass shooter, but there are indicators that Mr. Develin was doing more than fantasizing about mass violence. On several occasions, Mr. Develin combined antisemitic statements with acts evidencing a desire to engage in a hate-motivated mass shooting. He worked as a security officer for a private security company and was assigned to protect synagogues and

14

Jewish schools. PSR ¶ 44. On September 27, 2021, he posted a photograph of a synagogue that he was supposed to be protecting as a security guard and said he was "[h]aving an inner debate that if an active shooter comes in I might just join him." (*Id.* at 4.) On November 21, 2021, he posted a video titled "Jewish women" where he held a firearm and pointed it at people. (*Id.* at 6–7.) Two months later, he posted a photograph of the interior of a synagogue he was assigned to protect along with the text, "The holocaust didn't happen," and "If anything I'll scream 6 million wasn't enough," referring to the approximate number of Jews who were murdered in the Holocaust. (*Id.* at 4–5.) About a month after that, on March 11, 2022, Mr. Develin posted that he was at a Jewish school and said, "I will shoot the next parent dropping their kid off at the school." (*Id.* at 5.) In case his audience thought he might not be serious, he wrote, "Really need to get on their radar at the ATF that we aren't fucking around." (*Id.*) He was working at a Jewish school in Columbus at the time, and he posted a photograph of a Glock handgun on his lap. (*Id.* at 5, 8.)

      Mr. Develin's real-world acts included behavior meant to copycat or pay homage to past terrorists. On December 21, 2021, he said it was "time to turn wright pat airbase into Fort hood in 2009." PSR ¶ 48. This was a reference to the attack by an Army psychiatrist who killed 13 people and wounded 30 more at Fort Hood, the worst mass shooting at a U.S. military base. *Id.* Mr. Develin apparently believed the same should happen at nearby Wright-Patterson Air Force Base. *Id.*

      Mr. Develin had a particular obsession with the mosque shootings in Christchurch, New Zealand. In 2019, a man conducted two consecutive mass shootings at mosques in Christchurch, killing 51 people and injuring 40 more. The shooter wrote phrases on his firearms and magazines that reflected extreme right-wing, Islamophobic, xenophobic, and white supremacist ideology.

15

(Complaint, R.1-1 at 13.) This became widely known in part because he live-streamed much of the mass shooting online. Mr. Develin repeatedly searched for the Christchurch attacks on his devices, including 87 times on his laptop. (Complaint, R.1-1 at 13.) He then modified the magazine of an AR-type rifle to have the same words and phrases as the Christchurch shooter. (*Id.*) He made a video titled "Time to go to New Zealand," that showed off the hateful messages on his modified magazine. (*Id.* at 14–15.) His repetitive searches and copycat behavior show that he affiliated himself with people who committed mass violence in the name of hate ideology, and he crossed the barrier from mere online posting to real-world acts.

Mr. Develin not only saw violence as the means to achieve his extremist views; he also saw it as the answer to his petty, everyday annoyances. When he was frustrated that the Morgan County Sheriff's Office had not yet returned firearms it had seized from him, he did not just complain about it. (Complaint, R.1-1 at 18.) He did not limit himself to talk about wanting to "firebomb" the office and make a sheriff's deputy's family "look like what happened to the [R]hodens in my county," referring to the 2016 mass murder of the Rhoden family. (*Id.* at 18–20.) He went further. He sought out the deputy's home address in the White Pages, located and posted an aerial photograph of the deputy's home, calculated that the deputy's "closest neighbor is a quarter mile away," and identified an "elevated shooting position" that was "across the street of his home" from which he wanted to "snipe the family through the large living room window." (*Id.* at 21.) Similarly, on another occasion he discussed attacking the Budweiser brewing facility in Columbus and posted photographs of the facility. (*Id.* at 12.)

When a woman honked her car horn at Mr. Develin when he was swerving on the road, he showed her the gun in his hand, and then took and posted a video where he appeared to be pointing a gun at a law enforcement vehicle. (*Id.* at 17–18.) He also posted multiple photos and

16

videos where he trained a rifle on unsuspecting people walking by his home. (*Id.* at 16–17.) No matter the stimulus, it seems, his thoughts turned to violence.

The items law enforcement found in searches escalate the reason for concern. Agents found 17 firearms, more than 1,000 rounds of live ammunition, explosive components, Tannerite-brand explosive targets, ballistic plates, night-vision goggles, a ballistic helmet, a 3D printer, and IED manuals. PSR ¶¶ 15–16. Put together, and in the context of a man who models his behavior after a notorious white supremacist mass shooter, Mr. Develin's possession of these items presents added danger. An above-guidelines sentence is necessary to protect the public.

*Need to afford adequate deterrence and to promote respect for the law.* Mr. Develin knew what he was doing was against the law, but was undeterred. He made and sold lower receivers he knew were illegal. PSR ¶ 16. He knew that the conversion devices and the short-barreled rifle he made were illegal. PSR ¶ 17. Despite his implausible statement to the Probation Officer that he "did not understand the seriousness of manufacturing illegal firearms and devices," PSR ¶ 22, Mr. Develin repeatedly posted messages showing his in-depth knowledge of firearms and firearm regulations. (Complaint, R.1-1 at 22, 29–38.) His destruction and concealment of evidence also show he knew the seriousness of his criminal acts. PSR ¶¶ 21, 36–37. The recommended sentence will afford specific deterrence to Mr. Develin and should help efforts to deter other individuals considering similar firearms crimes.

*History and characteristics of the defendant.* Mr. Develin's history and characteristics are not mitigating and, if anything, they aggravate his culpability. He has known advantages shared by few defendants in this Court. He comes from an intact family with parents who enjoyed professional success. PSR ¶ 61. He is close with his family, and he told the Probation Officer that his parents provided "love, care, support, and structure." PSR ¶ 63. He had a childhood with

17

Boy Scouts, church, and sports, and without abuse, neglect, or substance abuse. *Id.* Although the PSR identifies the October 2021 suicide of a friend as an incident that caused his mental health to suffer, before that incident Mr. Develin was already manufacturing illegal firearms and envisioning joining forces with an active shooter at a synagogue. *See* PSR ¶¶ 16, 45.

In sentencing Mr. Develin, the Court should also take into account that he had two positions of trust and authority during the time of his criminal activity. He was a member of the Ohio Army National Guard and was also employed full-time as a security officer with a private security company. PSR ¶¶ 77–78, 82–85. He was assigned to protect synagogues and Jewish schools. PSR ¶ 44. Repeatedly and over the course of several months, Mr. Develin's acts demonstrated his presence at those locations introduced more danger than protection. (*See* Complaint, R.1-1 at 4–8.) The roles he held aggravate his culpability.

At bottom, Mr. Develin committed serious firearms crimes the dangerousness of which is not fully captured by the guidelines range. His illegal firearms activity presented greater risks in light of his extremist ideologies and willingness to take real-world steps toward violence. Given the nature and circumstances of Mr. Develin's offenses, the need to protect the public from further crimes of the defendant, the need for deterrence, and the other facts and circumstances of this case, an 87-month sentence would satisfy 18 U.S.C. § 3553(a).

## CONCLUSION

For the above reasons, a sentence of 87 months of imprisonment and 3 years of supervised release would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. Forfeiture is also required.

**Respectfully submitted,**

KENNETH L. PARKER
United States Attorney


s/ Peter K. Glenn-Applegate
PETER K. GLENN-APPLEGATE (0088708)
JESSICA W. KNIGHT (0086615)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: peter.glenn-applegate@usdoj.gov
jessica.knight@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 21st day of February, 2023, electronically upon counsel for the Defendant.

                                                    s/Peter K. Glenn-Applegate
                                                    PETER K. GLENN-APPLEGATE (0088708)
                                                    Assistant United States Attorney